IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES of AMERICA , *ex rel*. | § | |
| ROLAND WADE JACKSON | § | |
| Plaintiff, | § | |
| | § | |
| Vs. | § | CIVIL ACTION |
| | § | NO. _____ |
| UNIVERSITY OF NORTH TEXAS, | § | |
| TEXAS GUARANTEED STUDENT LOAN | § | |
| CORP., JP MORGAN CHASE BANK, N.A., | § | |
| NELNET, INC., and SLM CORP., | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW Plaintiff, United States of America, *ex rel*., Roland Wade Jackson, and files this Plaintiff's Original Complaint, and respectfully shows this Court the following:

### I. PARTIES

*1.*    Plaintiff, the United States of America, is the purported plaintiff pursuant to the provisions of 31 U.S.C. § 3729(a), *et seq*. ("Federal Civil False Claims Act"), which requires that this action first be served under seal to the United States of America for its consideration of this matter under the False Claims Act.

*2.*    Plaintiff *ex rel*., Roland Wade Jackson ("Jackson") is an individual and a resident of Denton, Texas, who may be contacted through his counsel, Craig M. Price, at Hammerle Finley, LLC, 2871 Lake Vista Dr., Suite 150, Lewisville, Texas 75067.

*3.*    Defendant University of North Texas ("UNT") is a public research university and the fourth largest public university in the state of Texas.  It is domiciled in Denton County, Texas, at 1155 Union Circle, Denton, Texas  76201, and the primary place of its business is in Denton County, Texas.

*4.*     Defendant Texas Guaranteed Student Loan Corporation ("TGSLC") is a public, nonprofit corporation that administered the FFELP.  It is located at 301 Sundance Parkway, Round Rock, Texas  78681, and it has or had agents in Denton County, Texas, which is in this Court's district, and TGSLC does or has transacted business in this district.

*5.*     Defendant JP Morgan Chase Bank, N.A., successor-in-interest-to Chase Manhattan Bank USA ("Chase"), is a global financial services firm that participated as a lender under the FFELP.  It is headquartered and domiciled at 270 Park Avenue, New York City, New York 100172014, and it has or had agents in Denton County, Texas, which is in this Court's district, and Chase does or has transacted business in this district.  Chase bought Bank One in 2004.

*6.*     Defendant Nelnet, Inc. ("Nelnet") is a Lincoln, Nebraska based lending conglomerate that is domiciled at, and has its primary place of business at, 121 S. 13th Street, Suite 201, Lincoln, Nebraska 68508.  Nelnet was founded as the UNIPAC Loan Service Corporation in 1978 and renamed Nelnet in 1996, and it has or had agents in Denton County, Texas, which is in this Court's district, and Nelnet does or has transacted business in this district. It serviced federal student loans under the FFELP.

*7.*     Defendant SLM Corporation (hereafter "Sallie Mae"), is a private corporation publicly traded United States corporation with its principal place of business at 300 Continental Dr., Newark, Delaware 19713.  It originated, serviced and collected on student loans under the FFELP.  It now provides private student loans.

## II.  JURISDICTION AND VENUE

*8.*     This Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on

this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  Under 31 U.S.C. § 3730(e)(4)(A), (B), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint, and Jackson is the original source of the information.

*9.*     Personal jurisdiction and venue are proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) & 1395(a), and 31 U.S.C. § 3732(a)(1), as one or more defendants are found in, have or had an agent or agents, have or had contacts, and transact or transacted business, in this district.  Additionally, the majority of the circumstances underlying this action occurred in Denton, Denton County, Texas, which is within this Court's jurisdiction.

### III.  BACKGROUND FACTS

*10.*     Created by Congress in 1965, the Higher Education Act ("HEA") and its regulations cover every aspect of the life cycle of a federally guaranteed student loan, including loan originations, repayment, default prevention, collections, guarantee payments and reinsurance payments.  The federal government operates two major student loan programs to help students and their parents meet the costs of post-secondary education: the FFELP, *formerly known as the Guaranteed Student Loan Program*, authorized by Part B of Title IV of the HEA [34 CFR 682; 20 USC §§ 1071-1087]; and the Direct Loan Program.

*11.*     The FFELP was a government-sponsored program that, until June 30, 2010, provided low interest loans with interest caps that limited the cost to help students and their parents pay for education beyond high school.  For example, the government provided FFELP lenders with a loan subsidy known as a "special allowance payment" that ensured private lenders that they would receive, at a minimum, a specified level of return on student loans.  Under FFELP, student loans, such as Federal Stafford, PLUS and Consolidated loans, were made through a public/private relationship involving borrowers, schools, lenders, guaranty agencies

and the federal government, in which private lenders, such as local banks or credit unions, provided the money for the loans.  The Health Care and Education Reconciliation Act of 2010 (Pub. L. 111-152, 124 Stat. 1029] eliminated new lending under the FFELP, and federal loans first disbursed on or after July 1, 2010, must now be made under the Federal Direct Loan Program (hereafter, "DLP").  The major distinction between the two programs is that FFELP loans were provided by *private sector lenders* (like Defendants Chase), while loans issued pursuant to the DLP are provided directly by the Department of Education.  In addition to these federal programs, private sector lenders still make traditional private education loans where the lender assumes the credit risk of the borrower.  Loans disbursed under the now-discontinued FFELP continue to be serviced according to the terms and conditions of the promissory note that the borrower signed when he or she obtained the loan.

*12.*    Under the FFELP, a student (here, Jackson) completed a Fee Application for Federal Student Aid ("FAFSA") form in order for an institution (Defendant UNT) to determine the type of aid to award.  The Department of Education would send that completed information in a Student Aid Report for the student to verify, complete and sign.  [34 CFR 668.2]  If there were no changes, the student submitted the Student Aid Report to the institution.  If changes were made, the student would send the Student Aid Report back to the Department of Education.  Upon receiving the corrected Student Aid Report from the Department of Education, the Student Aid Report would be sent to the institution by the student.

*13.*    The Student Aid Report (hereafter, "SAR") contained the Expected Family Contribution ("EFC"), which was used by the institution to calculate the student's need for aid.  The EFC was the amount a family could be expected to contribute toward a student's college costs. [20 U.S.C. § 1087nn]  The amount of aid actually needed was determined to be

the Cost of Attendance ("COA") minus the EFC (COA-EFC).  The COA, as determined by each institution, was the estimated full and reasonable cost of completing a full year as a full-time student.  [20 U.S.C. § 1087ll]  Similarly, the Estimated Financial Assistance ("EFA") was the total amount of aid a student would receive, and it included scholarships, grants, loans or other assistance known to the institution at the time the determination of the student's need was made.   [34 CFR 682.200(b); 20 U.S.C. § 1087vv(j)(1)]   The difference of COA-EFC determines how much need-based aid -- such as a subsidized loan or a Pell grant -- a student can be awarded.  The interest on subsidized loans is paid by the Department of Education as long as the student is currently enrolled in school.   Students who did not demonstrate a need for aid could still apply for non-need based aid, such as an unsubsidized loan, for which the interest is not paid by the Department of Education, and it accrues upon disbursement.  [34 CFR 682.102(e)(2); 20 U.S.C. § 1078(a) & (b)]   Non-need based aid was determined by the COA-EFA calculation.  [34 CFR 682.201]  The amount of a subsidized or an unsubsidized loan could not exceed the student's need or COA. [20 U.S.C. § 1087kk]

*14.*   The institution (here, UNT) would receive the student's SAR and determine the student's eligibility to receive financial aid based on the COA, EFC and EFA.   [34 CFR 682.102; 20 U.S.C. §§ 1078(a)(2), 1091(b)(2)(a)]  Without the SAR and EFC, the institution could not properly determine a student's eligibility or initiate the loan process.  The institution certified the loan amounts listed on the promissory note and a copy was sent to the lender (here, Chase) and to the guaranty agency (here, TGSLC) for review. [34 CFR 682.102(a)]

*15.*   The guaranty agency would guarantee the certified loan amount in the event a borrower died, became permanently and totally disabled, had a loan discharged in bankruptcy or defaulted [34 CFR 682.100(b)(1); 20 U.S.C. §§ 1077, 1078, 1091]  FFELP loans were

guaranteed by the federal government acting through non-profit guaranty agencies.  The guaranty agencies were either State agencies or private, non-profit entities that signed an agreement with the Department of Education to perform certain administrative roles in the student loan program and to administer the loan guarantee on behalf of the Department of Education.  The Department of Education has described the role of the guaranty agency in the student loan program in the following terms:

> In light of its role in the program and its responsibility for holding and protecting Federal funds, the guaranty agency's role is best characterized as that of a trustee holding money for the benefit of another . . . .  Under these circumstances, *a guaranty agency is responsible for acting as a fiduciary responsible for protecting the interests of the Department [of Education] and the taxpayers in the reserve funds*.

61 Fed. Reg. 49381, 49381 (Department of Education, Notice of Proposed Rule, September 19, 1996) (emphasis added).

*16.*     Using its own funds, the lender would approve the loan based on the information presented on the promissory note, and it would send the funds to the institution or notify the third-party servicer for disbursement of the loan proceeds to the student.  [34 CFR 682.206; 34 CFR 682.207]  The institution would receive the funds from the lender, re-certify aid before disbursement and obtain the student's signature before disbursement.  [34 CFR 682.207(b)(1); 20 U.S.C. § 1091(e)]  The disbursed loans would then be serviced by the lender or servicing agent (here, Nelnet and Sallie Mae).  [34 CRF 682.416(f)]

*17.*     Repayment of a FFELP loan began six months after the student ceased to be enrolled in school at least half time.  The initial six-month period before payments commenced was referred to as the grace period.  A loan became delinquent the first day after a payment became due and was unpaid.  The lender was required to request default aversion assistance from the guarantor between the 60th and 120th day of delinquency.  [34 CFR 682.411(i)]  If a

loan went into default--*i.e.*, was delinquent for at least 270 days--the lender could submit a default claim to the guaranty agency, in which it requested that the guaranty agency pay the lender for the unpaid principal and accrued interest.

18.     **If the guarantor determined that the lender did not comply with all of its obligations under the HEA, the lender forfeited its right to receive a guarantee payment upon default of the borrower.**   However, if the guaranty agency determined that the lender had complied with all of its obligations under the HEA, the guaranty agency had to pay to the lender the amount owed on the loan using federal monies held in a reserve fund called the "Federal Fund."

19.     The Department of Education, in turn, "reinsured" the guaranty agency for most of the amount of the default claim after finding that the guaranty agency had complied with all of its obligations under the HEA.   [34 CFR 682.100; 34 CFR 682.400; 20 USC §§ 1075, 1077, 1078] Because FFELP lenders do not bear the risk for losses that occur through borrower default, Congress established a system to monitor the lenders to ensure that they would diligently handle the origination and repayment of these loans.   To protect the taxpayers, the HEA: (1) imposes detailed requirements on all aspects of a lender's activities with regard to FFELP loans, and (2) creates a system of independent guarantor oversight of the lenders to ensure the lenders' compliance with these requirements.   The oversight of the guarantor protects the interests of the taxpayers in the payment of the FFELP loan guarantee.

20.     Once a guaranty agency pays a lender's default claim, the loan is assigned to the guaranty agency and it becomes responsible for making diligent efforts to collect on the loan.   Since the Department of Education reimburses a guaranty agency on default claims paid to the lender, the guaranty agency must return to the Department of Education most of the

amount it collects from the borrower.   As an incentive to continue to seek recovery of outstanding amounts due on loan defaults, a guarantor is permitted to retain a small portion of the revenue it collects from defaulted borrowers.

*21.*    Roland Jackson graduated from UNT and received his bachelor's degree in May 1996.  He began working for the Federal Emergency Management Agency in Denton, Texas, on September 12, 1996, where he continues to work today.  During his enrollment at UNT, Jackson received an athletic scholarship from 1992 through 1996.  Jackson's athletic scholarship award letters *specifically* stated that aid was awarded for tuition, fees, books and full on-campus or off-campus housing during 1993-1996.  UNT ***approved*** Jackson's athletic scholarship awards as follows: UNT approved Jackson's award for 1993-1994 on May 21, 1993, and Jackson accepted on May 3, 1993; UNT approved his award for 1994-1995 on May 16, 1994, and Jackson accepted on May 31, 1994; and UNT approved his award for 1995-1996 on August 17, 1995, and Jackson accepted on May 4, 1995.  **[EXHIBIT A, attached to the Affidavit of Roland W. Jackson, at pp. 1-3 (*all exhibits identified herein are attached to the Affidavit of Roland W. Jackson, which is attached to Plaintiff's Original Complaint*)]**

*22.*    During the 1993-1994 academic year, Jackson lived off-campus and his tuition was $1,738.35.  Jackson received $2,956.95 to be applied toward his off-campus housing and was entered into UNT's system.  **[EXHIBIT A, pp. 4-7 Lines 5, 6, Columns O, P]**  Jackson's expenses were an estimate of $4,695.30 and were paid by his scholarship award.  In addition to receiving the scholarship, Jackson had originally applied for a ***subsidized loan*** of $685 in August 1993 and an unsubsidized loan of $2,815.00 in September 1993 from Wells Fargo (formerly First State Bank) but these loans were cancelled by UNT as of September 20, 1993, due to an over-award that resulted after adjusting for Jackson's scholarship award.  **[EXHIBITS B, pp. 2-5**

**Line 32, 35; EXHIBIT C, p. 3]**   UNT returned both the ***subsidized loan*** of $685 and unsubsidized loan of $2,815.00 to Wells Fargo.   **[EXHIBIT B, pp. 2-3 Line 33]**   UNT then reoffered the **maximum** of an unsubsidized loan with Wells Fargo of $3,500.00 even after receiving the updated scholarship list on August 23, 1993, and despite having previously cancelled the same amount of loans that resulted in an over-award.   **[EXHIBIT B, pp. 2-5 Lines 29, 31, 35]** Jackson qualified as a second-year student at the time of the promissory note, and the maximum unsubsidized loan allowed was $3,500.00.   [34 CFR 682.204]   Wells Fargo's promissory note listed the COA as $9,050.00 and EFA as $8,430.00.   **[EXHIBIT D]**   The EFA of $8,430 included a PLUS loan of $3,550.00, which was later reoffered in 11/1993, as well as an estimate of Jackson's scholarship award ($4,695.30).   Based on the approved formula (COA-EFA), UNT *intentionally and falsely* certified and awarded an unsubsidized loan to Jackson from Wells Fargo of $3,500.00, which exceeded the COA by $2,880.00.   UNT's action was prohibited under the law and supports Jackson's claim of UNT intentionally falsely certifying unsubsidized loans that exceeded the COA.   [20 U.S.C. § 1097]   Wells Fargo's unsubsidized loan of $3,500.00 and Jackson's scholarship award of 4,695.30 did not exceed the COA ($9,050) for 1993-1994.   Therefore, UNT disbursed funds to Jackson, and Jackson actually did receive this unsubsidized loan from Wells Fargo, as well as copies of the disbursement checks proving Jackson's receipt of the funds.   The disbursement of the first loan check was unable to be located by Wells Fargo at the time but Jackson asserts he did receive it.   **[EXHIBIT E]**   Jackson does not dispute that loan with Wells Fargo.

*23.*   Additionally, Jackson's parent also originally applied for a PLUS loan of $3,550.00 for the 1993-1994 academic year, but it also was cancelled.   **[EXHIBIT C, p. 2]** UNT records indicate that the PLUS loan of $3,550.00 was cancelled due to an overaward that

resulted after adjusting for Jackson's scholarship award.  **[EXHIBIT B, pp. 2-5, Lines 32, 35]** UNT then reoffered the PLUS loan of $3,550.00 in November 1993 even after the certification of the unsubsidized loan from Wells Fargo of $3,500.00 in October 1993, receiving the updated scholarship list on August 23, 1993 and previously cancelling the same amount of loans that resulted in an overaward; and despite Jackson not exhibiting a need for this additional aid. **[EXHIBIT B, pp. 2-5 Lines 30-31; EXHIBIT C, p. 2]** [34 CFR 682.102; 34 CFR 682.505; 34 CFR 682.603(a), (d), (e); 20 U.S.C. §§ 1075, 1078-2(a)(1)(c) & (b), 1091(b)(2)(a) & (e), and 1094(a)(6)] UNT *intentionally* falsely certified and awarded a PLUS loan of $3,550.00 with Wells Fargo and *did exceed* the maximum amount of a PLUS loan allowed for a dependent undergraduate student.  The PLUS loan could not exceed the COA minus other EFA during any academic year.  [34 CFR 682.204(h)]  Well Fargo's PLUS loan of $3,500.00, along with Jackson's scholarship award of $4,695.30 and unsubsidized loan of $3,500.00, did exceed the COA ($9,050.00), which should have rendered these awards prohibited.  UNT's action was prohibited under the law and supports Jackson's claim of UNT intentionally falsely certifying unsubsidized loans that exceeded the COA.  [20 U.S.C. § 1097]

*24.*    TGSLC originally guaranteed the Wells Fargo's ***subsidized loan*** of $685 on August 13, 1993 and unsubsidized loan of $2,815.00 on September 3, 1993, but funds were later cancelled due to an overaward determined by UNT.  **[EXHIBIT C, p. 3]**  TGSLC then guaranteed an unsubsidized loan of $3,500.00 from Wells Fargo on October 14, 1993, that was ***falsely certified by UNT***.  **[EXHIBIT F]**  TGSLC also originally guaranteed the PLUS loan of $3,550.00 on October 14, 1993, but it too was cancelled due to an overaward.  **[EXHIBIT C, p. 2]** TGSLC then guaranteed the falsely certified PLUS loan of $3,550.00 on November 24, 1993.  **[EXHIBIT C, p. 2]**  TGSLC's actions support Jackson's claim of TGSLC intentionally

guaranteeing unsubsidized loans that exceeded the COA with the cancelled loans first, and then the approved loans.  TGSLC guaranteed the falsely certified/approved unsubsidized loan of $3,500 and PLUS loan of $3,550 from Wells Fargo that exceeded the amount allowed for a dependent undergraduate student and were not insured under the FFELP.   [34 CFR 682.402(k)(2); 34 CFR 682.406; 34 CFR 682.506; 34 CFR 682.204; 20 U.S.C. §§ 1075, 1097] Therefore, TGSLC *intentionally* guaranteed the falsely certified unsubsidized loan of $3,500.00 and PLUS loan of $3,550.00 with Wells Fargo because that was the maximum amount of unsubsidized and PLUS loans UNT that chose to award, but their action was prohibited under the law.  [20 U.S.C. § 1097].

   *25.*   During the 1994-1995 academic year, Jackson lived on-campus and his tuition was $1,772.95.  **[EXHIBIT A, pp. 4-7 Lines 7, 8]**  Based on room and board costs at UNT during the 1994-1995 academic year, Jackson's double occupancy room with a seven-day meal plan cost an estimated $3,650.36.  Jackson's total expenses were roughly $5,423.31 and paid by his scholarship award.  In addition to receiving the scholarship award, Jackson applied for an unsubsidized loan from Bank One (now Chase) for $5,500.00 in September 1994.  **[EXHIBIT G]**  Chase's promissory note listed the COA as $7,250.00 and EFA as $725.  UNT knew Jackson was living on campus and adjusted the budget as such, but it did not include the full amount of Jackson's athletic scholarship award of $5,423.31 into their system nor as part of the EFA.  **[EXHIBIT A, pp. 4-7 Lines 7, 8, Column O; EXHIBIT B, p. 2 Line 28]**  Instead, UNT listed the EFA as $725 even *after* accepting Jackson's athletic scholarship award.  **[EXHIBIT A, p 2]**  [34 CFR 682.603(a) & (e)]  UNT temporarily cancelled Chase's unsubsidized loan until the athletic department authorized the release of funds, although each had knowledge of Jackson's scholarship award.  **[EXHIBIT B, pp. 2-3 Lines 26-27]**  However, UNT denied the aid to

Jackson, and Jackson did not actually receive the funds from Chase.  [34 CFR 682.207(b)(ii); 34 CFR 668.92; 20 U.S.C. § 1078-7(d)(2)]  UNT audited the amount of unsubsidized loan Jackson was only eligible for and indicated that amount in their system as $1,025 for Fall 1994 and $800 for Spring 1995, totaling $1,825.  These amounts were entered into UNT's system prior to the promissory note being issued.  Chase's unsubsidized loan of $5,500 was greater than $1,825 and, therefore, *was not* physically disbursed to Jackson.  **[EXHIBIT A, pp. 15-17 Lines 7, 8]**  UNT *intentionally* falsely certified an unsubsidized loan of $5,500.00 with Chase because it was the maximum loan amount that was allowed for a dependent undergraduate student in the third year of study, but UNT's action was prohibited under the law.  [20 U.S.C. § 1094(a)(6); 34 CFR 682.204; 20 U.S.C. § 1097]  **Chase's loan of $5,500.00, along with Jackson's scholarship award of $5,423.31, exceeded the COA ($7,250.00), and the Chase loan was prohibited for Jackson to receive.  UNT denied Jackson Chase's loan of $5,500.00 and did not disburse funds to him.  But, UNT charged Jackson with having received the alleged $5,500.00 loan from Chase during the 1994-1995 academic year that he never actually received.  UNT received and retained Nelnet's checks of $2,640 (less fees) issued on September 21, 1994, and $2,640 (less fees) issued on December 29, 1994, *into UNT's own account* and never actually disbursed those funds to Jackson because loan exceeded COA ($7,250.00).  [EXHIBIT H; EXHIBIT I]** [34 CFR 682.207(b)(ii); 34 CFR 668.92; 20 U.S.C. § 1078-7(d)(2)]

*26.*     Chase approved the falsely certified unsubsidized loan of $5,500.00, but Jackson was *ineligible* to receive such award, and he never received it.  [34 CFR 682.206(c)]  Chase did *not* diligently seek to determine the amount of aid that Jackson already had been awarded before approving the loan.  Chase had a loan origination relationship with UNT and could *not* rely upon statements made by UNT during the loan-making process.  [34 CFR 682.206(a)(2)]  Chase

authorized Defendant Nelnet to release funds to UNT upon Chase's approval but *failed* to determine that all required forms were accurately completed by UNT prior to disbursement. **[EXHIBIT J, p. 1]** [34 CFR 682.206(b)]  Furthermore, neither Chase, UNT nor Nelnet has been able to provide proof of the approved disbursed loan checks to Jackson.  **[EXHIBIT H]**  These loan checks do not contain an authorized signature from the account holder, Defendant Nelnet. Chase *intentionally* approved the falsely certified unsubsidized loan.  [20 U.S.C. § 1097]

*27.*    TGSLC guaranteed Chase's unsubsidized loan of $5,500.00 on September 16, 1994 that was *falsely certified by UNT*.  **[EXHIBIT J, p. 2]**  As a result, TGSLC guaranteed an unsubsidized loan from Chase that exceeded the maximum amount allowed for a dependent undergraduate student and was not insured under the FFELP.  [34 CFR 682.402(k)(2); 34 CFR 682.406; 34 CFR 682.506; 20 U.S.C. §§ 1075, 1097]

*28.*    Due to the denial of Chase's unsubsidized loan of $5,500.00 by UNT, Jackson then applied for a reduced unsubsidized loan from Wells Fargo for $1,750.00 in November 1994. **[EXHIBIT K]**   Wells Fargo's promissory note listed the COA as $7,250.00 and EFA as $7,152.00.   The EFA of $7,152.00 included Chase's unsubsidized loan of $5,500.00, which Jackson never received, as well as the $725.00 that was listed as the EFA on Chase's promissory note.  Based on the approved formula (COA-EFA), UNT falsely certified an unsubsidized loan of $1,750.00 with Wells Fargo and exceeded the COA by $1,652.00.  UNT contacted the athletic department again for authorization to release funds to Jackson, although each already had knowledge of Jackson's scholarship award.  **[EXHIBIT B, pp. 2-3, Lines 21-23]**  UNT audited the amount of unsubsidized loan Jackson was only eligible for and indicated that amount in their system as $1,025 for Fall 1994 and $800 for Spring 1995, totaling $1,825.  **[EXHIBIT A, pp. 4-17 Lines 7, 8, Column BE]**   These amounts were entered into their system prior to the

promissory note being issued.  Wells Fargo's unsubsidized loan of $1,750.00 was less than $1,825.00 and, therefore, *was* physically disbursed to Jackson.  Wells Fargo's loan of $1,750.00 and Jackson's scholarship award of $5,423.31 did not exceed the COA ($7,250.00).  Therefore, Jackson actually did receive this unsubsidized loan of $1,750.00 from Wells Fargo, as well as copies of the disbursement checks proving his receipt of funds.  As a result, that loan is not being disputed.  **[EXHIBIT L]**  Because UNT alleged that Jackson received the $5,500.00 unsubsidized loan from Chase, UNT *intentionally* falsely certified the unsubsidized loan of $1,750.00 with Wells Fargo to award the maximum up to the COA, but UNT's action was prohibited under the law.  **[EXHIBIT B, pp. 2-3 Line 23]**  [20 U.S.C. § 1097]

*29.*    TGSLC also guaranteed Wells Fargo's unsubsidized loan of $1,750.00 on November 4, 1994, that was ***falsely certified by UNT***.  **[EXHIBIT M]**  Because TGSLC guaranteed the alleged $5,500.00 unsubsidized loan from Chase, TGSLC guaranteed a falsely certified/approved, unsubsidized loan from Wells Fargo that exceeded the maximum amount allowed for a dependent undergraduate student and was not insured under the FFELP.  [34 CFR 682.402(k)(2); 34 CFR 682.406; 34 CFR 682.506; 34 CFR 682.204; 20 U.S.C.  §§ 1075, 1097] TGSLC's actions support Jackson's claim that TGSLC intentionally guaranteed unsubsidized loans that exceeded the COA.  Therefore, TGSLC *intentionally* guaranteed the falsely certified, unsubsidized loan from Wells Fargo because that was the maximum amount of unsubsidized loan that UNT chose to award, but UNT's action was prohibited under the law.  [20 U.S.C. § 1097]

*30.*    During the 1995-1996 academic year, Jackson lived on-campus and his tuition was $1,756.95.  **[EXHIBIT A, pp. 4-7 Lines 11, 12]**  Based on room and board costs at UNT during the 1995-1996 academic year, Jackson's single occupancy room with a seven-day meal

plan cost an estimated $4,200.00.  Jackson's total expenses were roughly $5,956.95, and they were paid by his scholarship award.  In addition to receiving the scholarship award, Jackson applied for an unsubsidized loan from Chase for $5,500.00 in October 1995 but the promissory note was invalid.  **[EXHIBIT N]**  Chase's authorized lending official never provided a signature in the "Lender Section" to indicate that the loan had been approved nor was the promissory note signed by UNT's authorized school official.  Also, UNT provided an EFC of $9,812.00 that had not been calculated by the Department of Education.  The Department of Education calculated the EFC to be $8,967.00, which was not provided on the promissory note.  **[EXHIBITS N, O]** The EFC was the calculation determined *only* by the Department of Education and appeared on Jackson's SAR for UNT to use in determining the type of aid to award.  [34 CFR 682.102; 20 U.S.C. § 1087tt]  But Jackson never gave UNT his SAR for 1995-1996, which substantiates Jackson's allegation that UNT provided inaccurate information on the promissory note.  In addition to UNT using an unapproved EFC, UNT falsely certified the unsubsidized loan of $5,500.00.  UNT did not include the full amount of Jackson's athletic scholarship award of $5,956.95 into its system or as part of the EFA on this promissory note with Chase.  **[EXHIBIT A, pp. 4-7 Lines 11, 12, Column O]**  UNT *intentionally* provided the EFA of $0 after approving Jackson's athletic scholarship award.  **[EXHIBIT A, p. 3]**  [34 CFR 682.603(a) & (e)]  But UNT did not actually disburse finds to Jackson.  UNT audited the amount of unsubsidized loan Jackson was only eligible for and indicated that amount in UNT's system as $825 for Fall 1995 and $825 for Spring 1996, totaling $1,650.  **[EXHIBIT A, pp. 4-17 Lines 11, 12, Column BE]** These amounts were entered into UNT's system prior to the promissory note being issued.  Chase's unsubsidized *phantom* loan of $5,500 was greater than $1,650 and therefore, *was not* physically disbursed to Jackson.  UNT *intentionally* falsely certified Chase's unsubsidized

*phantom* loan of $5,500.00 because it was the maximum loan amount that was allowed for a dependent undergraduate student in the third year, or beyond, of study, but UNT's action was prohibited under the law.  [20 U.S.C. § 1094(a)(6); 34 CFR 682.204; 34 CFR 682.603(a) & (e); 34 CFR 668.92; 20 U.S.C. § 1094(a)(6); 20 U.S.C. § 1097]  **Chase's loan of $5,500.00, along with Jackson's scholarship award of $5,956.95, exceeded the COA ($7,250.00) and was prohibited for Jackson to receive.  But, UNT charged Jackson with having received the alleged $5,500.00 loan with Chase loan during the 1995-1996 academic year that he never actually received.  UNT retained Chase's electronic deposits of $2,640 (less fees) issued on October 31, 1995 and $2,640 (less fees) issued on January 3, 1996 in its own account and never actually disbursed those funds to Jackson because loan exceeded COA ($7,250.00). [EXHIBITS I, P]   [34 CFR 682.207(b)(ii); 34 CFR 668.92; 20 USC § 1078-7(d)(2)] Furthermore, UNT did not make notations in its system that loan proceeds were being received or authorized by the athletic department upon receipt of the funds from Chase for the 1995-1996 academic year.   UNT's last note referenced Jackson's enrollment for Summer 1995. [EXHIBIT B, pp. 2-3 Line 20]**

*31.*      Chase did not officially approve the unsubsidized *phantom* loan of $5,500.00 for the 1995-1996 academic year but still sent electronic debit notification of funds to UNT on October 31, 1995, and January 3, 1996.  **[EXHIBIT P]**   Chase approved the falsely certified unsubsidized *phantom* loan of $5,500.00, but Jackson was *ineligible* to receive such an award. [34 CFR 682.206(c)]  Chase did not diligently seek to determine the amount of aid that Jackson already had been awarded prior to approving the *phantom* loan.  Chase had a loan origination relationship with UNT and could *not* rely upon statements made by UNT during the loan-making process.   [34 CFR 682.206(a)(2)]  Chase *failed* to determine that all required forms were

accurately completed by UNT before sending funds to UNT.   [34 CFR 682.206(b)] Furthermore, neither Chase nor UNT has been able to provide proof of the funds that were allegedly disbursed to Jackson.   Chase *intentionally* approved the falsely certified unsubsidized ***phantom*** loan, but Chase and UNT's actions were prohibited under the law.  [20 U.S.C. § 1097]

*32.*     TGSLC guaranteed the unsubsidized ***phantom*** loan of $5,500.00 on October 24, 1995, that was ***falsely certified by UNT*** and without an approved signature from Chase's authorized lending official.  **[EXHIBIT Q]**  As a result, TGSLC guaranteed an unsubsidized ***phantom*** loan from Chase that exceeded the maximum amount allowed for a dependent undergraduate student and was not insured under the FFELP.  [34 CFR 682.402(k)(2); 34 CFR 682.406; 34 CFR 682.506; 20 U.S.C.  §§ 1075, 1097]  TGSLC *intentionally* guaranteed the falsely certified unsubsidized ***phantom*** loan with Chase because that was the maximum amount of an unsubsidized loan that UNT chose to award, but UNT's action was prohibited under the law. [20 U.S.C. § 1097]

*33.*      TGSLC's actions of guaranteeing these falsely unsubsidized loans from Chase of $5,500.00 for 1994-1995, and $5,500.00 for 1995-1996, left Jackson liable to the garnishments effected by the Department of Education in order to satisfy the claims for recoupment filed by Chase and Sallie Mae, which were paid by TGSLC pursuant to the FFELP.  **[EXHIBIT R]**

*34.*     From September 1994 to June 2000, Nelnet serviced the falsely certified unsubsidized Chase loan of $5,500.00 for the 1994-1995 academic year that was not insured under the FFELP.   Nelnet's loan checks were made payable to both Jackson and UNT. **[EXHIBIT H]**  UNT's school code (00359400) was included in the "Pay to the Order of" field alongside Jackson's name and social security number.  However, Nelnet has not been able to provide the approved disbursed loan checks to Jackson.  These loan checks do not contain an

authorized signature from Nelnet.   Nelnet also serviced the falsely certified unsubsidized *phantom* loan of $5,500.00 during the 1995-1996 academic year from Chase that was not insured under the FFELP.

35.    After Nelnet transferred the alleged debt to Sallie Mae on June 1, 2000, Sallie Mae also serviced the falsely certified unsubsidized Chase loan of $5,500.00 for the 1994-1995 academic year, as well as the unapproved, falsely certified unsubsidized *phantom* Chase loan of $5,500.00 for the 1995-1996 academic year.   **[EXHIBIT S, pp. 1, 3]**   Sallie Mae served as a "trustee" for the alleged debt.   [20 U.S.C § 1087-2; 34 CFR 668.92]   The lender codes for Sallie Mae (700191) and Chase (833253) were both included during the submission of the default claim to TGSLC on September 26, 2005.   **[EXHIBIT R, p. 1 Lines "54"]**   The insurance claim check was made payable by TGSLC to Chase (Chase Manhattan Bank) c/o Sallie Mae (LSC/PA).   **[EXHIBIT R, pp. 2-3]**   Therefore, Chase and Sallie Mae both had to endorse the insurance claim check prior to disbursement.   Chase did not ensure that the alleged debt was supported by an executed, legally-enforceable promissory note as proof of Jackson's indebtedness before submitting its default claim to Defendant TGSLC.   [34 CFR 682.206(d)]

36.    Chase and Sallie Mae were required to provide accurate documentation when the default claim was submitted.   [34 CFR 682.406(a)(1) & (10)]   **Nevertheless, and despite their failure to provide accurate documentation, Chase and Sallie Mae received the insurance claim payment from TGSLC on purported loans to Jackson that were not properly guaranteed or insured under the FFELP, and for proceeds that were never even received by Jackson.   Still, Jackson has had to reimburse TGSLC, through the Department of Education's garnishments of his federally-owed monies, for the entire amount of these purported loan proceeds, plus interest.**

37.     According to the foregoing facts, UNT certified that loan proceeds from Chase's promissory notes, which were serviced by Nelnet and then Sallie Mae in the total amount of $11,000.00, were disbursed to Jackson when, in fact, they never were disbursed to him. Nevertheless, Defendants Chase and Sallie Mae have been reimbursed by Defendant TGLSC, the guarantor, for these purported loans; and Jackson has had monies garnished by the Department of Education to replace the funds paid by TGSLC, improperly, to Chase and Sallie Mae. **[EXHIBIT T]**   As a result, UNT, Chase, Sallie Mae, Nelnet and TGSLC are financially responsible  for the monies that were improperly seized from him for repayments to Chase and Sallie Mae for loans that were  falsely  certified and improperly  guaranteed.   [34 CFR 682.402(e); 34 CFR 682.609; 34 CFR 668.32; 20 U.S.C. § 1097]

38.     UNT, Chase, Wells Fargo and TGSLC displayed a pattern of approving and guaranteeing falsely certified loans.  The actions of UNT, Chase, Sallie Mae, Nelnet and TGSLC caused Jackson to sustain monetary damages.  Jackson's federal payments from 2007 to 2013, and tax returns of 2006, 2011 and partial 2010 have been improperly seized and applied to loans that were **NEVER DISBURSED TO JACKSON**.  These alleged loans were unsubsidized Guaranteed Student Loans with Chase of $5,500.00 for the 1994-95 academic year and $5,500.00 for the 1995-1996 academic year.  **Jackson did not receive these alleged loan proceeds, yet he has had federal payments and other monies -- which were lawfully owed to him -- seized to pay off these two guaranteed student loans that he never received.** **[EXHIBIT T]**   Defendants jointly participated in certifying, approving, guaranteeing and servicing the loans that were not insured under the FFELP but that were used to justify the seizure of monies from Jackson, even though he never received the proceeds of those loans that

were not -- as a result of Defendants' failure to adhere to the statutory requirements of the FFELP -- even entitled to guaranteed student loan status and protection.

*39.* Chase, TGSLC and the Department of Education have the authority to share any information on fraud and abuse. [34 CFR 668.14(b)(17)]

*40.* Jackson is currently awaiting a hearing request with the Department of Education to prove the alleged debt was falsely certified and not insured under the FFELP. [20 U.S.C. § 1087; 34 CFR 685.215] Jackson formally requested a hearing in March 2011, and he sent two additional requests for status updates (March 2011 and June 2012). [20 U.S.C. **§** 1095; 34 CFR 684.410] The Department of Education advised Jackson on March 29, 2011, that he would be granted a hearing request, but Jackson has not received any word regarding the date for his hearing since March 29, 2011. **[EXHIBIT U, p. 3; EXHIBIT V]** Jackson requested a hearing *before* his federal payments and tax returns had been involuntarily garnished to pay off the alleged debt. To date, Jackson has not received any hearing from the Department of Education, but he has had the entire amount of the improper "loans" garnished from his federal monies to satisfy the purported loans in full.

## IV. CAUSES OF ACTION

*41.* Through his attorney, *qui tam*, Roland Jackson brings this action to recover damages and civil penalties on behalf of the United States of America arising from violations of the Federal Civil False Claims Act by Defendants UNT, Chase, Nelnet, Sallie Mae and TGSLC) (collectively hereafter known as "Defendants"). This Complaint alleges a pattern and practice of fraudulent conduct by Defendants in connection with the nation's largest federally guaranteed student loan program, the FFELP. Defendants UNT, Chase, Sallie Mae, Nelnet and TGSLC fraudulently filed documents stating that two guaranteed student loans were disbursed to

Jackson, and when Jackson failed to pay those loans, or "defaulted," Defendants Chase and Sallie Mae received reimbursement from Defendant TGSLC through its insurance program for the guaranteed student loans. Thereafter, the Department of Education sought to recover the amounts paid by its agent, Defendant TGSLC, to Defendants Chase and Sallie Mae by garnishing monies owed to Jackson, both through his federal income tax return and through federal payments owed in the discharge of his duties as a federal employee with FEMA.  Even though Jackson never received the funds for which Defendants Chase and Sallie Mae made claims upon -- and received reimbursement from -- Defendant TGSLC, Jackson has had to repay the Department of Education for such sums that were fraudulently obtained – first by Defendants Chase and Sallie Mae in the form of its guaranteed student loan insurance, and second by the Department of Education, acting on behalf of its guarantor, TGSLC, in the form of garnishments of federal payments owed to Jackson**.**  There is no discernible account of what UNT did with the purported loan proceeds that it received but failed to disburse to Jackson.  **In short, Defendants have essentially obtained payment from Jackson to reimburse them for purported loan proceeds, plus interest, from two improperly guaranteed student loans,** *even though Jackson never received the funds from the purported guaranteed student loans,* **all in violation of the Federal Civil False Claims Act, 31 U.S.C. §. 3729(a),** *et seq.* **("False Claims Act").**

42.      The False Claims Act prohibits knowingly presenting or causing to be presented to the federal government a false or fraudulent claim for payment or approval.  [31 U.S.C. § 3729(a)(1)(A).]  It also prohibits knowingly making or using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.  [31 U.S.C. § 3729(a)(1).]  Additionally, the False Claims Act prohibits conspiring with another person to defraud the

government by getting a false or fraudulent claim allowed or paid.  31 U.S.C. § 3729(a)(1)(C).  Any person who violates the False Claims Act is liable for a civil penalty of between $5,500.00 and $11,000.00 for each violation, plus three times the amount of the damages sustained by the United States.  31. U.S.C. § 3729(a)(1).  [28 CFR §85.3(9) (raising penalty limits pursuant to False Claims Act)]  The False Claims Act allows any person having information about false or fraudulent claims to bring an action for himself and the United States, and to share in any recovery.  The False Claims Act requires that the complaint be filed under seal for a minimum of sixty (60) days (without service on the defendants during that time) to enable the government (a) to conduct its own investigation without the defendant's knowledge, and (b) to determine whether to join the action.  Based on these provisions, *qui tam* Plaintiff Roland Jackson seeks through this action to recover damages and civil penalties arising from Defendants' violations of the False Claims Act.

*43.*   Action can be taken against an institution or servicer by the Secretary of Education if funds exceed the amount a student is eligible for, or for engaging in fraudulent activity.   [34 CFR 668.83 and 668.92]  The Secretary may impose penalties on a lender or guaranty agency that has violated or failed the regulation, after a hearing.

*44.*   Defendants conspired to maximize loan amounts based on the loans not exceeding the COA.  Defendants had access to the National Student Loan Data System ("NSLDS") prior to and subsequent to the loan process, and they received copies of Jackson's promissory notes for the 1994-1996 academic years, which proves the discrepancy in aid awarded, but Defendants still concealed their fraud in the face of Jackson's claim.  [20 U.S.C. § 1092(b), (c)]

*45.*   Each of Chase's loans have collectively been reported and appeared on Jackson's credit reports provided by Equifax (69), TransUnion (406) and Experian (252), beginning in

September 1996 through June 2012, for a total of 727 times.  The Defendants' actions subjected Jackson to an offset of federal payments owed to him, as well as damage to his credit report and the constant threat of losing his employment as a federal employee during the renewals of his security clearance and background checks in 2006, 2008, 2011 and 2012.  **To date, $26,758.60 has been improperly seized from Jackson and applied to the improperly guaranteed debt.**

## V.  DAMAGES

*46.*      Each time that any Defendant submitted or paid a fraudulently or improperly obtained claim, or each time the Department of Education seized or confiscated, on behalf of Defendant TGSLC, any monies from Jackson in order to repay the purported guaranteed student loan alleged by Defendants, Jackson and the United States suffered from a separate violation.  As a result, Jackson seeks to recover, on behalf of the United States and through this *qui tam* action, the sum of $564,275.80, which represents three times the actual damages of $26,758.60 (or, $80,275.80), plus $484,000.00, which represents the maximum civil penalty of $11,000.00 multiplied times the 44 violations committed by the Defendants (maximum allowed= $11,000.00; minimum allowed is $5,500.00 per violation), and the foregoing amount does not include an award for reasonable attorneys' fees and expenses, which is also sought in an amount to be determined by this Court.   [31 U.S.C. § 3729(a)(7)**.**]   **The specific actions of which Jackson complains are as follows:**

- UNT retained two loan checks of $2,640.00 each, one in 1994 and one in 1995, and two electronic deposits of $2,640.00 each, one in 1995 and one in 1996) (***total of 4 violations for which a penalty is sought***);

- Chase and Sallie Mae submitted the default claim for the amounts of $10,264.89 on July 26, 2005, and $9,430.91 on July 26, 2005, and received the combined

insurance claim payment of $20,758.37 on September 23, 2005 and September

26, 2005 (***total of 4 violations for which a penalty is sought***);

- TGSLC issued the insurance claim payment of $20,758.37 on September 20,

  2005, to Chase and Sallie Mae (***total of 1 violation for which penalty is sought***);

- TGSLC issued an administrative offset of Jackson's 2006 tax return of $6,432

  (2/16/07); and administrative offsets against federal payments owed to Jackson of

  $376.91 (5/21/07), $684.75 (6/4/07), $732.60 (6/15/07), $538.33 (6/26/07),

  $62.86 (7/9/07) and $676.42 (7/26/07), all of which have been seized (***total of  7***

  ***violations for which penalties are sought***);

- TGSLC subrogated the alleged debt to the Department of Education to continue

  the administrative offsets of Jackson's 2008 tax return of $2,586 (11/4/11), 2010

  partial tax return of $220.91 (4/26/13), and 2011 tax return of $1,808 (4/19/13);

  and federal payments of $807.84 (8/13/07), $259.03 (1/29/09), $305.50 (2/27/09),

  $159.88 (4/21/09), $226.45 (5/18/09), $343.35 (6/8/09), $136.50 (7/9/09),

  $172.00 (7/13/09), $249.10 (8/12/09), $749.06 (8/28/09), $337.66 (8/31/09),

  $261.20 (11/2/09), $268.30 (1/6/10), $373.75 (8/9/10), $459.50 (10/5/10),

  $807.51 (10/22/10), $113.01 (3/22/11), $381.50 (5/6/11), $1,639.20 (9/20/12),

  $1,324.87 (10/4/12), $263.50 (10/26/12), $1,302.07 (11/13/12), $1,197.52

  (1/2/13) and $501.52 (1/3/13), all of which have been seized (***total of   27***

  ***violations for which penalties are sought***);

*47.*     Pleading in the alternative, and without waiving the foregoing allegation, Jackson

asserts that Defendants are jointly and severally liable to Jackson for the sum of $26,758.60 on

the grounds that they each engaged in a civil conspiracy to convert monies rightfully belonging

to Jackson in the amount of $26,758.60, and Jackson has made demand upon each Defendant for the return of such monies.

*48.* Pleading in the alternative, and without waiving the foregoing allegation, Jackson asserts that Defendants are jointly and severally liable to Jackson for the sum of $26,758.60 on the grounds that each Defendant has been unjustly enriched by the amount of $26,758.60, which was improperly garnished from Jackson pursuant to the joint actions of the Defendants in unlawfully holding him responsible for the amount of guaranteed student loan that he never received.

*49.* Jackson further seeks to recover from the Defendants, jointly and severally, his reasonable and necessary attorneys' fees, prejudgment and post-judgment interest, to the extent allowed by law, and such other and further relief to which he may show himself justly entitled, at law or in equity.

WHEREFORE, PREMISES CONSIDERED, United States of America, *ex rel*., Roland Jackson moves this Court, after notice and hearing, to grant Jackson judgment as follows:

1. Actual damages in the amount of $26,758.60 times three, or $80,275.80, plus $484,000.00 in civil penalties for 44 violations, or, in the alternative, at least 15 percent and not more than 25 percent of the total proceeds of this action or settlement, pursuant to 31 U.S.C. § 3730(d)(1), if the government undertakes this action, or not less than 25 percent and not more than 30 percent of the total proceeds of this action or settlement, pursuant to 31 U.S.C. § 3730(d)(2), if the government does *not* undertake this action;

2. Prejudgment and post-judgment interest in the amount permitted by law;

3. Reasonable and necessary attorneys' fees, costs and expenses, as permitted by 31 U.S.C. § 3730(d)(2);

4. In the alternative, actual damages in the amount of $26,758.60;

5. Prejudgment and post-judgment interest on the actual damages in an amount permitted by law; and

6.  Such other relief to which Jackson may show himself justly entitled, at law or in equity.

Respectfully Submitted,

Craig M. Price
State Bar No. 16284170
Email: cmp@hammerle.com
HAMMERLE FINLEY LAW FIRM
2871 Lake Vista Dr., Suite 150
Lewisville, Texas 75067
Ph. 972-436-9300
Fax: 972-436-9000
ATTORNEYS FOR ROLAND JACKSON

## CERTIFICATE OF MOTION TO SEAL

The undersigned counsel hereby certifies, pursuant to Eastern District of Texas Local Rule CV-5(a)(7)(A) that a Motion to Seal Proposed *Qui Tam* Plaintiff's Original Complaint has been filed, under seal, with the United States District Court for the Eastern District of Texas, that seeks to have this foregoing document filed under seal.

Craig M. Price